# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------- X

DIANA CAMPUZANO,
158 West 84th Street
New York, New York 10024;

STUART FORCE,
*Individually and as personal representative of the estate*
*of Taylor Force*,                                                  Case no. 24-cv-1642
60 Autumn Oaks Drive,
The Hills, Texas 78738;

BEATRIZ GONZALEZ,
*Individually and as personal representative of the estate*
*of Nohemi Gonzalez,*
207 S. Montana Avenue
Roswell, New Mexico 88203;

MICAH LAKIN AVNI,
*individually and as personal representative of the Estate*
*of Richard Lakin,*
48 Yehuda HaLevi Street
Tel Aviv, 6578202, Israel;

MURRAY BRAUN,
128 North McCadden Place
Los Angeles, CA 90004,

                              *Plaintiffs*,

                    -against-

UNITED STATES OF AMERICA;

COMPTROLLER GENERAL OF THE UNITED
STATES, GENE DODARO
Government Accountability Office
441 G St., NW, Room 7100
Washington, DC 20548;

GOVERNMENT ACCOUNTABILITY OFFICE

441 G St., NW, Room 7100

Washington, DC 20548;

ATTORNEY GENERAL MERRICK GARLAND,

950 Pennsylvania Ave. NW

Washington, DC 20530;

UNITED STATES DEPARTMENT OF JUSTICE,

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001;

SECRETARY OF THE TREASURY JANET YELLEN,

1500 Pennsylvania Avenue, NW

Washington, D.C. 20220;

UNITED STATES DEPARTMENT OF THE

TREASURY,

1500 Pennsylvania Avenue, NW

Washington, D.C. 20220;

UNITED STATES VICTIMS OF STATE SPONSORED

TERRORISM FUND,

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001;

SPECIAL MASTER MARY PATRICE BROWN,

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001.

*Defendants*.

------------------------------------------------------------------- X

## COMPLAINT

Plaintiffs, by their counsel, complain of the Defendants, and hereby allege for their Complaint as follows:

## INTRODUCTION

1.      This action concerns the United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144 ("USVSST Act" or "Act")

2.      The USVSST Act creates the United States Victims of State Sponsored Terrorism Fund ("USVSST Fund" or "Fund"), into which funds deriving from criminal forfeitures, civil penalties, fines, and civil forfeitures, relating to violation of sanctions regulations, as well as an initial allocation from the Treasury,[1] are deposited. The Fund then distributes these funds *pro rata* to victims of state-sponsored terrorism holding qualifying judgments against state sponsors of terrorism.

3.      In this action Plaintiff seeks a mandatory order pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 and a declaratory judgment requiring Defendant Comptroller General of the United States ("Comptroller General") to issue a report required to be issued by statute, 34 U.S.C. § 20144(d)(4)(D)(i), as to which the deadline has passed and without which the USVSST Fund cannot proceed to distribute $3 billion of funds which are the subject of the report to Plaintiffs and other victims of terrorism who have submitted claims to the USVSST Fund.

4.      Plaintiff also seeks a declaratory judgment requiring Defendants to transfer to the USVSST Fund, as required by 34 U.S.C. § 20144(e)(2)(A)(i) and (ii), the approximately $4.3 billion received already and anticipated to be received by the Government as criminal penalties

---

[1] The initial allocation corresponded to a portion of the money the Government had received from a large fine paid by Bank Paribus for violating the sanctions regime against Iran.

and forfeitures in the case of *U.S.A. v. Binance Holdings Limited* and the approximately $630 million as criminal penalties and forfeitures *in U.S.A. v. British-American Tobacco, P.L.C.*

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6.      This Court further has subject matter jurisdiction as this action seeks a declaratory judgment under 28 U.S.C. § 2201.

7.      This Court further has subject matter jurisdiction pursuant to 5 U.S.C. § 702, as plaintiff has suffered a legal wrong because of agency action and has been adversely affected or aggrieved by agency action, and plaintiff seeks relief other than money damages and states a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity.

## THE PARTIES

8.      Plaintiff Diana Campuzano was a plaintiff in *Campuzano v. Islamic Republic of Iran,* D.D.C. 00-cv-2328 (RDM) and in that action obtained a money judgment including $18,952,725 for compensatory damages against the Islamic Republic of Iran ("Iran"), a state sponsor of terrorism, as well as an award of punitive damages, such judgment having been entered by this Court (Urbina, *J.*) on September 10, 2003.

9.      Plaintiff Stuart Force, individually and as personal representative of the Estate of Taylor Force, was a plaintiff in *Force v. Islamic Republic of Iran,* D.D.C. 16-cv-1468 (RDM) and in that action obtained a money judgment including $6.25 million for compensatory damages against Iran for Stuart Force individually and $1,584,230 for compensatory damages against Iran

for the Estate of Taylor Force, as well as an award of pre-judgment interest and punitive damages, such judgment having been entered by this Court (Moss, *J.*) on August 8, 2022.

10.    Plaintiff Beatriz Gonzalez, individually and as personal representative of the Estate of Nohemi Gonzalez, was a plaintiff in *Cain-Baarbe et al v. The Syrian Arab Republic,* E.D.N.C. 20-cv-00230 (BO) and in that action obtained a money judgment including $7.5 million for compensatory damages against Syria for Beatriz Gonzalez individually and $3,493,216 for compensatory damages against Syria for the Estate of Nohemi Gonzalez, as well as an award of pre-judgment interest and punitive damages, such judgment having been entered on June 28, 2023.

11.    Plaintiff Micah Lakin Avni, individually and as personal representative of the Estate of Richard Lakin, was a plaintiff in *Force v. Islamic Republic of Iran,* D.D.C. 16-cv-1468 (RDM) and in that action obtained a money judgment including $6.25 million for compensatory damages against Iran for Micah Lakin Avni individually and $1.5 million for compensatory damages against Iran for the Estate of Richard Lakin, as well as an award of pre-judgment interest4 and punitive damages, such judgment having been entered by this Court (Moss, *J.*) on August 8, 2022.

12.    Plaintiff Murray Braun was a plaintiff in *Braun v. Islamic Republic of Iran,* D.D.C. 15-cv-1136 (BAH) and in that action obtained a money judgment including $2.5 million for compensatory damages against the Islamic Republic of Iran ("Iran"), a state sponsor of terrorism, as well as an award of punitive damages, such judgment having been entered by this Court (Howell, *C.J.*) on January 10, 2017.

13.    As victims of terrorism holding judgments for compensatory damages against Iran, Plaintiffs are eligible to receive distributions from the Fund, and in fact Plaintiffs have applied to the Fund for compensation, have been determined by the USVSST Fund to be eligible for distributions.

14.     Defendant Merick Garland is the Attorney General of the United States, and is named as a defendant herein in his official capacity.

15.     Defendant Gene Dodaro is the Comptroller General of the United States, and is named as a defendant herein in his official capacity.

16.     Defendant United States Department of Justice ("DOJ") is a department of the government of Defendant USA.

17.     Defendant Janet Yellen is the Secretary of the Treasury of the United States, and is named as a defendant herein in her official capacity.

18.     Defendant United States Department the Treasury ("DOT") is a department of the government of Defendant USA.

19.     Defendant United States Victims of State Sponsored Terrorism Fund is a fund "established in the Treasury," 34 U.S.C. § 20144(e)(1), and as such is part of the Treasury, but is named in this action as a nominal defendant for the sake of clarity.

20.     Defendant Mary Patrice Brown is the Special Master of the Defendant USVSST Fund, and is named as a defendant herein in her official capacity.

## THE USVSST ACT

21.     Enacted on December 18, 2015, the Act "established in the Treasury a fund to be designated as the United States Victims of State Sponsored Terrorism Fund," 34 U.S.C. § 20144(e)(1), and established funding for it, including an appropriation of $1.025 billion for the Fund in FY 2017. § 20144(e)(5). In addition, the Act mandates that certain forfeiture proceeds, penalties, and fines be deposited by Defendant DOT into the Fund if "forfeited or paid to the United States after the date of [the Act's] enactment." These funds are to come from civil and criminal matters involving prohibited transactions with state sponsors of terrorism. § 20144(e)(2).

The Act, as amended, provides that that the Fund will continue operations until 2030, § 20144(e)(6). Thus, the Fund may continue to accumulate and distribute funds over its 15-year life.

22.     While the Fund is "in the Treasury," § 20144(e)(1), it is required to be administered by a special master to be appointed by the Attorney General who is to be compensated from the Fund, § 20144(b)(1)(C), and that special master is authorized to utilize a designated number of Department of Justice personnel, § 20144(b)(1)(B).

23.     The Act provides that after the singular initial allocation made in the first year of the USVSST Fund's existence, the USVSST Fund is funded as follows:

**(2) Deposit and transfer**

Beginning on December 18, 2015, the following shall be deposited or transferred into the Fund for distribution under this section:

**(A) Forfeited funds and property**

**(i) Criminal funds and property**

All funds, and the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a criminal penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Trading with the Enemy Act (50 U.S.C. App. 1 et seq.), or any related criminal conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

**(ii) Civil funds and property**

Seventy-five percent[2] of all funds, and seventy-five percent of the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a civil penalty or fine arising from a violation of any license, order, regulation, or

---

[2] At the time the Act was enacted, this provision said 50%. It was amended in 2019 to say 75%.

prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Trading with the Enemy Act (50 U.S.C. App. 1 et seq.), or any related conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

**(B) Transfer into Fund of certain assigned assets of Iran and election to participate in Fund**

**(i) Deposit into Fund of assigned proceeds from sale of properties and related assets identified in In Re 650 Fifth Avenue & Related Properties**

**(I) In general**

Except as provided in subclause (II), if the United States receives a final judgment forfeiting the properties and related assets identified in the proceedings captioned as In Re 650 Fifth Avenue & Related Properties, No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008), the net proceeds (not including the litigation expenses and sales costs incurred by the United States) resulting from the sale of such properties and related assets by the United States shall be deposited into the Fund.

**(II) Limitation**

The following proceeds resulting from any sale of the properties and related assets identified in subclause (1) shall not be transferred into the Fund:

(aa) The percentage of proceeds attributable to any party identified as a Settling Judgment Creditor in the order dated April 16, 2014, in such proceedings, who does not make an election (described in clause (iii)) to participate in the Fund.

(bb) The percentage of proceeds attributable to the parties identified as the Hegna Judgment Creditors in such proceedings, unless and until a final judgment is entered denying the claims of such creditors.

**(ii) Deposit into Fund of assigned assets identified in Peterson v. Islamic Republic of Iran**

If a final judgment is entered in Peterson v. Islamic Republic of Iran, No. 10 Civ. 4518 (S.D.N.Y.), awarding the assets at issue in that case to the judgment creditors identified in the order dated July 9, 2013, those assets shall be deposited into the Fund, but only to the extent, and in such percentage, that the rights, title, and interest to such assets were assigned through elections made pursuant to clause (iii).

34 U.S.C. § 20144(e)(2).

## FIRST CLAIM FOR RELIEF
## FOR A DECLARATORY JUDGMENT AND/OR AN ORDER UNDER THE ADMINISTRATIVE PROCEDURE ACT AGAINST DEFENDANTS COMPTROLLER GENERAL DODARO AND GOVERNMENTAL ACCOUNTABILITY OFFICE, AND A MADATORY INJUNCTION, COMPELLING HIM TO ISSUE THE STATUTORILY REQUIRED REPORT FORTHWITH

24.     Pursuant to the Justice for United States Victims of State Sponsored Terrorism Act, as amended, specifically 34 U.S.C. § 20144(d)(4)(D)(i),

Not later than 1 year after December 29, 2022, and in accordance with clauses (i) and (ii) of paragraph (3)(A), the Comptroller General of the United States shall conduct an audit and publish in the Federal Register a notice of proposed lump sum catch-up payments to the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims who have submitted applications in accordance with subsection (c)(3)(A)(ii)(II) on or after such date of enactment, in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022.

*Id.*

25.     The report described in this section was published in the Federal Register on the last permissible day, December 28, 2023. (Ex. A). A copy is available at: https://www.federal

register.gov/documents/2023/12/28/2023-28674/notice-of-planned-methodology-for-estimating-lump-sum-catch-up-payments-to-eligible-1983-beirut.

26.    The methodology and result contained in that report was blatantly wrong. Even though Congress set up the statutory scheme as requiring an audit and report from the GAO, there was really very little to audit or calculate, as the assignment is very simple. All that is required is to determine the percentage of compensatory damages awards to be paid to the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims that would enable them to catch up with other claimants who had received payments from the USVSST Fund during the first four rounds of distributions. This could not be simpler. There were four distributions, in which the following payment percentages of claimants' compensatory damages were paid:

| | |
|---|---|
| Round 1 | 13.66% |
| Round 2 | 4.20% |
| Round 3 | 5.84% |
| Round 4 | 0.40% |
| Total: | 24.10% |

27.    The catch-up percentage is thus 24.10%. There are no further calculations to do. Under 34 U.S.C. § 20144(d)(4)(D)(ii) the December 28, 2023 publication of the GAO report triggered a 30-day opportunity for public comment, which expired January 27, 2024, but since that was a Saturday the public comment period ended no later than January 29, 2024.

28.    Under 34 U.S.C. § 20144(d)(4)(D)(iii), not later than 30 days after the expiration of the comment period, which works out to February 28, 2024, the Comptroller General was required to submit a report to the Committee on the Judiciary and the Committee on Appropriations of the Senate, the Committee on the Judiciary and the Committee on Appropriations of the House

of Representatives, and the Special Master on the amounts of the lump sum catchup payments for the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims.

29.    The Comptroller General has not submitted such a report. Instead, the GAO is apparently working on a second notice of proposed methodology, which it intends to promulgate for public comment. But there was no provision in statute for the GAO to issue a second "do over" proposed methodology. Proceeding in that fashion is a violation of the statute. The statute allowed for a proposed methodology, a 30-day period for public comment, and a final report. By failing to issue the required report the Comptroller General has failed to comply with the statute.

30.    Other than reviewing the percentages listed in the chart above, there is no further calculation that the Comptroller General has to do to issue the report to Congress. Though Congress set it up as a report with public comment, etc., the task was really quite simple and it is a travesty to the victims who are awaiting compensation that this has been turned into a cause for delay.

31.    A letter setting forth the above was sent to the Comptroller General on or about April 1, 2024 (Ex. B).

32.    The Comptroller General responded in an April 22, 2024 letter (Ex. C) candidly stated "we acknowledge that we did not meet the date identified in the statute for submitting a report to congressional committees and the Special Master" because "GAO determined that the best path forward to address this provision of the Fairness Act was to publish two separate Federal Register Notices on this topic, and solicit public comments after each notice, before issuing the final report." (Ex. C) In other words, the Comptroller General deliberately disregarded the statutory mandate and made up its own rules, never mind what Congress said it should do.

33.    Worse, the Comptroller General has not issued the promised second report, and has given no indication when it will issue.

34.     The Comptroller General's letter also referenced a previous report from 2021 regarding catch-up payments for Sudan claims, but that was a red herring since the Sudan claims have to do with the process at hand, as the Comptroller General tacitly acknowledges in its letter:

> As noted above, GAO has received additional data and comments, and we have refined our planned methodology since we issued our first Federal Register Notice. Our forthcoming Federal Register Notice will report estimated lump sum catch-up payments based on our refined methodology, including an updated estimated percentage calculation.

(Ex. C).

35.     Yet the calculation that Congress tasked the GAO with doing is actually super-simple, as noted above and in the April 1 letter (Ex. B).

36.     The result of the failure of the Comptroller General to issue the required report is that the USVST Fund cannot proceed to issue the catch-up payments to the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims—who have been waiting 41 years and 18 years, respectively, for compensation.

37.     The inability of the USVSST Fund it issue catchup payments has a downstream effect on Plaintiffs and thousands of other victims who have submitted claims to the Fund because of the way it impacts the residual distribution of the lump sum catch-up payment reserve fund, as provided by 34 U.S.C. § 20144(d)(4)(D)(iv):

> (iv)    **Lump sum catch-up payment reserve fund.**
>
> (I)    **In general.** There is established within the Fund a lump sum catch-up payment reserve fund, to remain in reserve except in accordance with this subsection.
>
> (II)    **Authorization.** Not earlier than 90 days after the date on which the Comptroller General submits the report required under clause (iii), and not later than 1 year after such date, the Special Master shall authorize lump sum catch-up payments from the reserve fund established under subclause (I) in amounts equal to the amounts described in subclauses (I) and (II) of clause (iii).

(III)    **Appropriations**

(aa)    **In general.** There are authorized to be appropriated and there are appropriated to the lump sum catch-up payment reserve fund $3,000,000,000 to carry out this clause, to remain available until expended.

(bb)    **Limitation.** Except as provided in subclause (IV), amounts appropriated pursuant to item (aa) may not be used for a purpose other than to make lump sum catch-up payments under this clause.

(IV)    **Expiration**

(aa)    **In general.** The lump sum catch-up payment reserve fund established by this clause shall be terminated not later than 1 year after the Special Master disperses *[sic]* all lump sum catch-up payments pursuant to subclause (II).

(bb)    **Remaining amounts.** All amounts remaining in the lump sum catch-up payment reserve fund in excess of the amounts described in subclauses (I) and (II) of clause (iii) shall be deposited into the Fund under this section.

*Id.*

38.    Thus, pursuant to this section, the balance of the $3 billion allocation after allocating money for the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims is allocated to the USVSST Fund, from where it will be distributed in due course to Plaintiffs and the thousands of other claimants who are not 1983 Beirut barracks bombing victims and not 1996 Khobar Towers bombing victims.

39.    Defendant Comptroller General's failure to issue the required report thus prevents the USVSST Fund from applying the remainder of the funds allocated to compensate 9/11 victims, the Plaintiffs herein, and all other victims of state-sponsored terrorism who hold judgments against state sponsors of terrorism. 18,083 claimants are having their compensation held up because the Comptroller General has not issued the statutorily required report.

40.    The amendments to the USVSST Act requiring this report were passed in December 2022, which means the Comptroller General has had more than enough time to review this matter and issue the report.

41.    Plaintiffs and all the other thousands of claimants who have submitted claims to the USVSST Fund are real people who have been grievously injured, or who have had close family members killed or grievously injured, and have been living with the pain and suffering of being victims of terrorism for years. Delaying the process of getting them compensation, which enables them to ease their suffering in a small way, is simply unconscionable.

**The Administrative Procedure Act**

42.    The Administrative Procedure Act ("APA") which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Interpreting the APA, the Supreme Court has held that "Congress rarely intends to prevent courts from enforcing its directives to federal agencies. For that reason, this Court applies a 'strong presumption' favoring judicial review of administrative action. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986).

43.    The *Bowen* court elaborated:

We begin with the strong presumption that Congress intends judicial review of administrative action. From the beginning "our cases [have established] that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (citing cases). *See generally* L. Jaffe, Judicial Control of Administrative Action 339-353 (1965). In *Marbury v. Madison,* 1 Cranch 137, 163 (1803), a case itself involving review of executive action, Chief Justice Marshall insisted that "[the] very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws." Later, in the lesser known but nonetheless important case of *United States v. Nourse,* 9 Pet. 8, 28-29 (1835), the Chief Justice noted the traditional observance of this right and laid the foundation for the modern presumption of judicial review:

> It would excite some surprise if, in a government of laws and of principle, furnished with a department whose appropriate duty it is to decide questions of right, not only between individuals, but between the government and individuals; a ministerial officer might, at his discretion, issue this powerful process…leaving to the debtor no remedy, no appeal to the laws of his country, if he should believe the claim to be unjust. But this anomaly does not exist; this imputation cannot be cast on the legislature of the United States.

Committees of both Houses of Congress have endorsed this view. In undertaking the comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers that culminated in the passage of the Administrative Procedure Act (APA), 5 U. S. C. §§ 551-559, 701-706, the Senate Committee on the Judiciary remarked:

> Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board.

S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945). Accord, H. R. Rep. No. 1980, 79th Cong., 2d Sess., 41 (1946). The Committee on the Judiciary of the House of Representatives agreed that Congress ordinarily intends that there be judicial review, and emphasized the clarity with which a contrary intent must be expressed:

> The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.

*Ibid.*

Taking up the language in the House Committee Report, Justice Harlan reaffirmed the Court's holding in *Rusk v. Cort,* 369 U.S. 367, 379-380 (1962), that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner,* 387 U.S., at 141 (citations omitted). This standard has been invoked time and again when considering whether the Secretary has discharged "the heavy burden of

overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision," *Dunlop v. Bachowski,* 421 U.S. 560, 567 (1975).

Subject to constitutional constraints, Congress can, of course, make exceptions to the historic practice whereby courts review agency action. The presumption of judicial review is, after all, a presumption, and "like all presumptions used in interpreting statutes, may be overcome by," inter alia, "specific language or specific legislative history that is a reliable indicator of congressional intent," or a specific congressional intent to preclude judicial review that is "'fairly discernible' in the detail of the legislative scheme." *Block v. Community Nutrition Institute*, 467 U.S. 340, 349, 351 (1984).

*Bowen,* 476 US at 670-73 (square brackets by the Court).

44.     The APA permits judicial review of "agency action." 5 U.S.C. § 702.

45.     The term "agency action" used here is defined as "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13). The term "failure to act" as used here is not defined in the statute, but has been held to apply to situations "where the agency fails to take a 'discrete' action it is legally required to take." *Pub. Citizen, Inc. v. FERC,* 839 F.3d 1165, 1172 (D.C. Cir. 2016) *quoting Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 62-63 (2004). Action is "legally required" if the statute provides a "specific, unequivocal command" to an agency or "a precise, definite act…about which [an official has] no discretion whatever." *Pub. Citizen, Inc.*, 839 F.3d at 1172, *quoting Norton*, 542 U.S. 55 at 63.

46.     Plaintiff's claims in this action all fit handily into this rubric. Plaintiff seeks nothing more than an order compelling Defendants to comply with "specific, unequivocal command[s]," *id.*, about which Plaintiff contends Defendants have "no discretion whatever," *id.*

47.     Here, Defendants Comptroller General of the United States and Government Accountability Office have failed to comply with the requirement of 34 U.S.C. § 20144(d)(4)(D)(iii), not later than 30 days after the expiration of the comment period, which

works out to February 28, 2024, the Comptroller General was required to submit a report to the Committee on the Judiciary and the Committee on Appropriations of the Senate, the Committee on the Judiciary and the Committee on Appropriations of the House of Representatives, and the Special Master on the amounts of the lump sum catchup payments for the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims.

48.     This Court should therefore issue an order in the nature of a writ of mandamus or similar vehicle compelling the Comptroller General to submit the report required by § 20144(d)(4)(D)(iii) forthwith, and should enter a declaratory judgment holding that this report is overdue and required to be issued forthwith.

49.     Further, because Plaintiffs and all the other victims who have submitted claims to the Fund are being irreparably harmed because the Comptroller General's failure to issue the report on the timeline Congress directed which will prevent a distribution being made to non-1983 Beirut barracks bombing victims and non-1996 Khobar Towers bombing victims, a preliminary injunction should issue requiring the Comptroller General to issue the required report forthwith.

**SECOND CLAIM FOR RELIEF**
**FOR A DECLARATORY JUDGMENT DECLARING THAT 75% OF THE**
**FINES AND FORFEITURES COLLECTED OR TO BE COLLECTED IN**
**THE "BINANCE" AND "BRITISH TOBACCO" CASES ARE REQUIRED**
**TO BE DEPOSITED INTO THE USVSST FUND**

50.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

51.     The Act provides that after the singular initial allocation made in the first year of the USVSST Fund's existence, the USVSST Fund is funded as follows:

**(2) Deposit and transfer**

Beginning on December 18, 2015, the following shall be deposited or transferred into the Fund for distribution under this section:

**(A) Forfeited funds and property**

**(i) Criminal funds and property**

All funds, and the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a criminal penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Trading with the Enemy Act (50 U.S.C. App. 1 et seq.), or any related criminal conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

**(ii) Civil funds and property**

Seventy-five percent of all funds, and seventy-five percent of the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a civil penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Trading with the Enemy Act (50 U.S.C. App. 1 et seq.), or any related conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

34 U.S.C. § 20144(e)(2).

**A.     _USA v. Binance Holdings Limited_**

52.     On November 14, 2023 the United States commenced a criminal prosecution by filing a felony information against Binance Holdings Limited, a cryptocurrency company in the United States District Court for the Western District of Washington, _USA v. Binance Holdings Limited,_ case no. 2:23-cr-00178-RAJ. (Ex. D).

53.     In that felony information, the Government alleged that:

Starting at least as early as August 2017 and continuing until at least October 19 2022 (the "relevant period"), Defendant, led by its founder, owner, and chief executive officer, Changpeng Zhao, and certain of its officers, directors, employees, and agents knowingly failed to register as a money services business ("MSB"), willfully violated the Bank Secrecy Act ("BSA") by failing to implement and maintain an effective anti-money laundering ("AML") program, and willfully caused violations of U.S. economic sanctions issued pursuant to the International Emergency Economic Powers Act ("IEEPA"); in a deliberate and calculated effort to profit from the U.S. market without implementing controls required by U.S. law. During the relevant period, Defendant operated a cryptocurrency exchange wholly or in substantial part in the United States by serving a substantial number of U.S. users. And by failing to register with the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") as an MSB, Defendant operated an unlicensed money transmitting business ("MTB") in violation of U.S. law. Defendant operated as an unlicensed MTB in part to prevent U.S. regulators from discovering that Defendant facilitated billions of dollars of cryptocurrency transactions on behalf of its customers, including U.S. customers, without implementing appropriate "know your customer" ("KYC") procedures, conducting adequate transaction monitoring, or establishing sufficient controls that would have prevented its U.S. customers from engaging in transactions in violation of U.S. sanctions and to prevent Defendant from processing other transactions involving illicit proceeds. As a result, Defendant willfully caused millions of dollars of cryptocurrency transactions between U.S. persons and persons in jurisdictions that are subject to comprehensive U.S. sanctions in violation of IEEPA. Due to its willful failure to implement an effective AML program, Defendant processed transactions by users who operated illicit mixing services and laundered proceeds of dark.net market transactions, hacks, ransom ware, and scams. In part the cause of this scheme, and because Defendant prioritized growth, market share, and profits over compliance with U.S. law, Defendant Binance Holdings Limited doing business as Binance.com ("Binance") became the largest cryptocurrency exchange in the world.

(Ex. D, ¶ 1).

54.     Thus, by the Government's own allegations, the conduct of Binance fell into the

categories covered by § 20144(e)(2)(A)(i) and (ii) quoted above.

55.     On November 21, 2023 the Government and Binance entered a plea agreement

pursuant to which Binance pleaded guilty to the charges of the felony information.

56.    On February 13, 2024 an Order of Forfeiture was entered in *USA v. Binance Holdings Limited* which provided as follows:

• The sum of money in the amount of $1,612,031,763 is forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as it reflects the profits the Defendant obtained from its commission of Conducting an Unlicensed MTB (Count 2), to which it entered a guilty plea.

• The sum of money in the amount of $898,618,825 is forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), as it reflects the proceeds the Defendant obtained from its commission of Violation of IEEPA (Count 3), to which it entered a guilty plea.

• The total of the sums of money forfeitable on Counts 2 and 3 is $2,510,650,558, and as such that is the total amount of the Money Judgment.

(Ex. E).

57.    On February 23, 2024 a judgment was entered in *USA v. Binance Holdings Limited* which provided for a criminal fine of $1,805,475,575, incorporated by reference the forfeiture order, and set forth the following schedule for payment of the above:

No later than 30 days after the Defendant's sentencing, payment of $898,618,825, the Count 3 money judgment;

No later than 6 months after the Defendant's sentencing, payment of $1,612,031,763 of the criminal fine, subject to the crediting set forth in Paragraph 14(a) of the Plea Agreement, *see* Dkt. 23 & 28; and

No later than 15 months after the Defendant's sentencing, payment of $1,805,475,575 of the Count 2 money judgment and the remainder criminal fine, subject to the crediting set forth in Paragraphs 14(a) and 16 of the Plea Agreement. *See* Dkt. 23 & 28.

(Ex. F).

58.    On May 24, 2024 the Government filed a Notice of Partial Satisfaction of Forfeiture Money Judgment in *USA v. Binance Holdings Limited,* in which it acknowledged that the first payment due under the schedule set forth above in the amount of $898,618,825 had in fact been

paid to Defendant United States Treasury two months earlier and was required to be credited to the USVSST Fund:

> The United States has confirmed with the U.S. Department of the Treasury that on March 21, 2024, Defendant made a $898,618,825 payment towards the satisfaction of the money judgment for Count 3, pursuant to the payment schedule outlined in the Plea Agreement. Dkt. No. 23 ¶ 24; Dkt. No. 28. Accordingly, the United States hereby gives notice of the partial satisfaction, in the amount of $898,618,825, towards Defendant's total money judgment forfeiture obligation of $2,510,650,558.

> Iran was designated a state sponsor of terrorism in 1984. By statute, "[a]ll funds…forfeited or paid to the United States…arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.)…arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism" shall be deposited or transferred to the U.S. Victims of State Sponsored Terrorism Fund. 34 U.S.C. § 20144.

(Ex. G).

59.     Despite the Government's acknowledgement in the May 24, 2024 Notice of Partial Satisfaction that $898,618,825 had in fact been received by Defendant U.S. Department of the Treasury two months ago on March 21, 2024, ***and*** the Government's acknowledgement in that Notice of Partial Satisfaction that these funds are required to be deposited into the USVSST Fund, the USVSST Fund's website, accessed on May 27, 2024 and indicating it was giving information about case deposits as of April 17, 2024 (which is after March 21, 2024), does not reflect the deposit of the $898,618,825 into the USVSST Fund. (Ex. H).

60.     The absence of the $898,618,825 from the listing on the USVSST website is made particularly conspicuous by an email exchange between Plaintiffs' counsel herein and the "Claims Administrator" of the USVSST Fund, a copy of which is attached as Ex. I. On March 22, 2024, the day acter the $898,618,825 was paid by Binance, Plaintiff's counsel wrote to the USVSST Fund:

Changing gears, I would also like to inquire regarding the November 21, 2023 guilty plea by Binance, pursuant to which Binance agreed to forfeit $2,510,650,588 and to pay a criminal fine of $1,805,475,575 for a total financial penalty of $4,316,126,163. According to court records, the order of forfeiture was entered February 13, 2024, and the judgment was entered February 23, 2024. The judgment makes clear that the conviction was on charges that included violation of the International Emergency Economic Powers Act ("IEEPA"), which means that under 34 USC 20144(e)(2)(A)(i) "all" of the forfeited funds and the civil penalty *[sic; should say* "criminal fine") are required to be deposited into the Fund.

There is no mention of the Binance case on the Fund's website. Could you confirm whether the fine has been paid and what is the status of the forfeited assets? Have these funds been deposited into the Fund? Is there any reason why you expect they will not be? I think you would agree that informing the thousands of victims who would receive a share of this money that such a substantial amount is being deposited into the Fund would be a great comfort for them.

(Ex. I). A week later on March 29, 2024, the USVSST Fund responded, saying:

As to the Binance case that you referenced, the USVSST Fund staff cannot provide additional information at this time. Once the qualifying case proceeds (if any) are received, the USVSST Fund will update its website.

(Ex. I). Plaintiff's counsel responded on April 1, 2024 saying:

Turning to the Binance case, your response dodged my question. All you said is that you will update your website if and when funds are received from the Binance case. But I asked you to confirm whether the fine has been paid and what is the status of the forfeited assets, and whether there is any reason why you expect the proceeds of the Binance fines and forfeitures will not be deposited into the Fund?

(Ex. I). On April 3, 2024 the USVSST Fund responded:

As to your questions about the Binance case, as stated in the USVSST Fund's prior response, the USVSST Fund staff cannot provide additional information about this case at this time. For both the Binance and British American Tobacco (BAT) matters, the USVSST Fund will determine whether proceeds from enforcement actions in these cases, if any, qualify for deposit into the USVSST Fund. For information about how potential qualifying cases are assessed, please see the Qualifying Cases section of the USVSST Fund's Frequently Asked Questions, available on the USVSST Fund website. If the USVSST Fund determines that any portion of the penalty payments made in these cases qualifies for deposit, the USVSST Fund will initiate the transfer of funds. Once the qualifying case proceeds

from the Binance or BAT cases (if any) are received, the USVSST Fund will update its website.

The USVSST Fund does not participate in any federal enforcement actions, including those that may result in deposits into the USVSST Fund. See frequently asked question 9.4 ("What role does the USVSST Fund play in the qualifying cases?"). Questions regarding payments made in these federal enforcement actions should be directed to the entities responsible for imposing the fine or penalty and collecting the proceeds.

(Ex. I).

61.    The refusal of Defendant USVSST Fund and Defendant Special Master Brown to acknowledge receipt of the money from Binance and deposit of that money into the USVSST Fund, despite the Government's acknowledgement in the Notice of Partial Satisfaction that those funds had actually been received on March 21, 2024 and that it was required to be deposited into the USVSST Fund, and/or the failure of Defendant Department of the Treasury and Defendant Secretary of the Treasury Janet Yellen, Defendant United States Department of Justice and Defendant Attorney General Merrick Garland to deposit the money from Binance into the USVSST Fund, despite the statutory requirement that such funds be deposited into the USVSST Fund, directly impacts Plaintiffs and all the other victims of terrorism who have submitted claims to the USVSST Fund and are entitled to receive a share of that money from the USVSST Fund, entitles Plaintiffs to maintain this action seeking a declaratory judgment requiring the Binance money to be deposited into the USVSST Fund.

**B.     *USA v. British American Tobacco P.L.C.***

62.    On or about April 7, 2023 the United States commenced a criminal prosecution by filing a felony information against British American Tobacco, P.L.C. and related entities in the United States District Court for the District of the District of Columbia, *USA v. British American Tobacco P.L.C.,* 1:23-cr-00118-BAH. (Ex. J).

63.     The felony information filed by the Government against British American Tobacco P.L.C. laid out a scheme to do business in North Korea through a third-party company in Singapore, in violation of the bank fraud statute and the International Emergency Economic Powers Act (IEEPA). As Defendant Department of Justice later explained the scheme in a press release:

> Specifically, in 2007, BAT spun off its North Korea sales to a third-party company, issuing a press statement that it was no longer involved in North Korea tobacco sales. In reality, BAT continued to do business in North Korea through the third-party company and BATMS maintained control over all relevant aspects of the North Korean business. Between 2007 and 2017, BAT and BATMS ran the payments for the tobacco sold to North Korean entities through the third-party company, resulting in approximately $418 million of U.S. dollar cash and correspondent banking transactions from North Korea to the third-party company in Singapore – money that was then passed on to BATMS and BAT. To make these payments, North Korean purchasers used front companies so that U.S. banks – which processed the transactions – would not know about the connection to North Korea.

(Ex. K)

64.     On April 13, 2023 British-American Tobacco Marketing (Singapore) Private Limited, a defendant in *USA v. British American Tobacco, P.L.C.,* entered into a plea agreement with the Government pursuant to which, *inter alia,* it would be subject to a criminal forfeiture in the amount of $189,541,115, and a penalty and fine in the amount of $440,350,738. (Ex. L).

65.     On or about April 27, 2023 a second amended judgment was entered in *USA v. British American Tobacco, P.L.C.* requiring the pleading guilty defendant to pay the amounts set forth in the plea agreement, and included a payment schedule which provided as follows:

**Payable on or before September 30, 2023**

| Fine | $220,275,369.00 |
|---|---|
| Forfeiture | $94,770,557.50 |

**Payable on or before September 30, 2023**

| Fine | $220,275,369.00 |
|---|---|
| Forfeiture | $94,770,557.50 |

| Total | $629,891,853.00* |
|---|---|

\* Exclusive of interest calculated pursuant to 18 U.S.C. § 3612(f)(2)

(Ex M).

66.    On or about September 28, 2023 a stipulation was docketed on the *USA v. British American Tobacco, P.L.C.* docket indicating that the first payment had been made:

The parties stipulate and agree that, as of September 29, 2023, the following payments satisfy the amounts due on September 30, 2023, under the parties' Agreement, the Amended Judgment of the Court, and the Forfeiture Order (which include $10 credits related to test payments for each of the forfeiture and fine):

To the U.S. District Court Clerk

$224,258,953.80

To the U.S. Marshals Service

$96,528,257.95

(Ex. N).

67.    Thus, $320,787,211 has been paid, which should have been deposited into the USVSST Fund in 2023.

68.    Inexplicably, the $320,787,211 from British-American Tobacco has not been deposited into the USVSST Fund, as reflected on the list of case deposits from the USVSST Fund's website (Ex. H).

69.    On April 1, 2024 Plaintiff's counsel wrote to the USVSST Fund regarding the British-American Tobacco case as follows:

According to a Justice Department press release from a year ago, https://www.justice.gov/opa/pr/united-states-obtains-629-million-settlement-british-american-tobacco-resolve-illegal-sales, BAT pleaded guilty and was required to pay $629,891,853 in criminal fines and forfeitures. There was also $508,612,492 in civil penalties, https://ofac.treasury.gov/media/931666/download?inline=&utm_medium=email&utm_source=govdelivery. Court documents for the criminal case show there was a payment schedule included in the Second Amended Judgment providing for payments as follows:

**Payable on or before September 30, 2023**

| Fine | $220,275,369.00 |
|---|---|
| Forfeiture | $94,770,557.50 |

**Payable on or before September 30, 2023**

| Fine | $220,275,369.00 |
|---|---|
| Forfeiture | $94,770,557.50 |

| Total | $629,891,853.00 |
|---|---|

According to this payment schedule, $220 million in criminal fines, and $94 million in forfeiture proceeds, should have been received by September 30, 2023. Please advise why that money—approximately $314 million—is not listed on your website as having been deposited into the USVSST Fund. And why has the USVSST Fund also apparently not received the statutorily required 75% of the approximately $508 million in civil *[sic;* should say "criminal"] penalties from BAT?

(Ex. I).

70.     On or about April 3, 2024, the USVSST Fund responded:

For both the Binance and British American Tobacco (BAT) matters, the USVSST
Fund will determine whether proceeds from enforcement actions in these cases, if
any, qualify for deposit into the USVSST Fund. For information about how
potential qualifying cases are assessed, please see the Qualifying Cases section of
the USVSST Fund's Frequently Asked Questions, available on the USVSST Fund
website. If the USVSST Fund determines that any portion of the penalty payments
made in these cases qualifies for deposit, the USVSST Fund will initiate the transfer
of funds. Once the qualifying case proceeds from the Binance or BAT cases (if any)
are received, the USVSST Fund will update its website.

The USVSST Fund does not participate in any federal enforcement actions,
including those that may result in deposits into the USVSST Fund. See frequently
asked question 9.4 ("What role does the USVSST Fund play in the qualifying
cases?"). Questions regarding payments made in these federal enforcement actions
should be directed to the entities responsible for imposing the fine or penalty and
collecting the proceeds.

(Ex. I).

71.     The refusal of Defendant USVSST Fund and Defendant Special Master Brown to

acknowledge receipt of the money from British-American Tobacco and deposit of that money into

the USVSST Fund, despite the Government's acknowledgement in the stipulation that those funds

had actually been received by the Government as of September 29, 2023, and/or the failure of

Defendant Department of the Treasury and Defendant Secretary of the Treasury Janet Yellen,

Defendant United States Department of Justice and Defendant Attorney General Merrick Garland

to deposit the money from British-American Tobacco into the USVSST Fund, despite the statutory

requirement that such funds be deposited into the USVSST Fund, directly impacts Plaintiffs and

all the other victims of terrorism who have submitted claims to the USVSST Fund and are entitled

to receive a share of that money from the USVSST Fund, entitles Plaintiffs to maintain this action

seeking a declaratory judgment requiring the British-American Tobacco money to be deposited

into the USVSST Fund.

### C.    A Declaratory Judgment Should Enter

72.    Defendants have violated 34 U.S.C. § 20144(e)(2)(A)(i) and (ii) by failing to deposit into the USVSST Fund the funds from the Binance and British-American Tobacco cases.

73.    Defendant USVSST Fund itself and Defendant Special Master Brown have failed to take steps to make sure that moneys statutorily required to be deposited into the USVSST Fund in fact are deposited.

74.    Defendants' failure to deposit these funds into the USVSST Fund damages Plaintiffs as unless the funds are deposited into the USVSST Fund they will not be available for distribution to Plaintiffs and all the other terror victim claimants who have submitted their claims to the USVSST Fund.

75.    It has thus become clear that absent a declaratory judgment from the Court, Defendants will not comply with their statutory obligations to deposit the Binance and British-American Tobacco money into the USVSST Fund.

76.    By reason of the foregoing, the Court should issue a declaratory judgment requiring Defendants to deposit the Binance and British-American Tobacco money into the USVSST Fund forthwith.

77.    This Court should further issue an order in the nature of a writ of mandamus or similar vehicle compelling Defendants to deposit the Binance and British-American Tobacco money into the USVSST Fund forthwith.

78.    Further, because Plaintiffs and all the other victims who have submitted claims to the Fund are being irreparably harmed because Defendants have failed to deposit the Binance and British-American Tobacco money into the USVSST Fund, and because if that money is spent on something else Defendants will likely assert that they cannot deposit it into the USVSST Fund, a

preliminary injunction should issue requiring Defendants to deposit the Binance and British-American Tobacco money into the USVSST Fund forthwith.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues legally triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment for the relief requested herein, plus attorney's fees and the costs of this action to the extent permitted by law.

Dated: June 6, 2024
      Brooklyn, New York

<div style="margin-left:40%">

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs*

By:_____
    Robert J. Tolchin
    (D.C. Bar #NY0088)

829 East 15th Street, Box 7
Brooklyn, New York 11230
(718) 855-3627
rtolchin@berkmanlaw.com

</div>